```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  3-16-17
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

MFW ASSOCIATES, LLC,

                              Plaintiff,

               -v-

STEVEN PLAUSTEINER and SUSAN PLAUSTEINER,

                              Defendants.

------------------------------------------------------------------------X

15 Civ. 2513 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

      This decision resolves a motion by plaintiff MFW Associates, LLC ("MFW") to dismiss a counterclaim for fraudulent inducement brought by defendants Steven and Susan Plausteiner (the "Plausteiners").

      MFW claims the Plausteiners owe unpaid money under a loan agreement that they entered into in connection with the development of a now-closed Vermont ski resort, the Ascutney Mountain Resort (the "Resort"). The Court previously denied the Plausteiners' motion to dismiss. Relevant here, the Plausteiners there argued that the operative loan agreement, "the Amended Forbearance Agreement" ("AFA"), released them from all personal liability on the outstanding debt. The Court, however, held that while the AFA on its face released the Plausteiners in one capacity (as loan "Guarantors"), it did not clearly release them from liability in their other capacities relevant to the transaction (as "Pledgors," and, with other Pledgors, as the "Debtor"). The Court left open the possibility of discovery to probe any contractual ambiguity on this point.

The Plausteiners then brought the counterclaim at issue.  It alleges that, while negotiating the AFA, Dan Purjes—MFW's manager, and the Plausteiners' co-investor in the Resort—orally agreed that the Plausteiners would be released from all personal liability for the unpaid debt.  It alleges that the Plausteiners entered into the AFA, under which they made payments towards the debt and renegotiated security interests on the mortgage on the Resort, in reliance on Purjes's oral statement.  But, the Plausteiners allege, Purjes concealed his intention, in the event the debt remained unpaid, to argue that the AFA did not release the Plausteiners from personal liability on the unpaid debt in capacities other than as Guarantors and to pursue further recovery from them.  Based on Purjes's misleading presentation, the Plausteiners claim, they were fraudulently induced to pay $1 million towards the debt and to enter into the AFA.

MFW now moves to dismiss.  It argues that the Plausteiners do not allege that Purjes made any misrepresentations of present material facts in negotiating the agreement.  Instead, MFW notes, the basis for the Plausteiners' counterclaim is that Purjes concealed his intention to assert that the AFA permits him to pursue claims against the Plausteiners.  Such a claim, MFW argues, effectively sounds in—and merges into a claim for—breach of contract, such that any claim the Plausteiners might have had would sound in contract, not fraudulent inducement.  Separately, MFW argues that the Plausteiners' claim is untimely, brought outside of the six-year statute of limitations period governing fraud claims under New York law.

The Court grants MFW's motion to dismiss for two reasons.  First, the Plausteiners' counterclaim does not allege, as required, misrepresentations of present fact, as opposed to a future intention not to perform.  Second, the counterclaim is untimely.

## I.      Background

The Court reviews first the factual background to this dispute, including the series of events that gave rise to the AFA, the key document here.  The Court then reviews the litigation to

date on MFW's claims, including the Court's decision denying the motion to dismiss those claims, and its assessment there of the text of the AFA.  The Court then reviews the Plausteiners' ensuing counterclaim and the factual allegations underlying it.

A.    **Factual Background**[1]

1.    **The $4.5 Million Loan and Snowdance's Default**

MFW is a limited liability company managed by Purjes.  Complaint ¶¶ 1, 13.  MFW is a creditor of Snowdance, LLC ("Snowdance"), a limited liability company that owned the Resort. *Id.* ¶¶ 6–7, 14.  The Plausteiners were majority owners and sole officers of Snowdance at all relevant times, *id.* ¶ 7; they were also the sole owners of other entities involved in the Resort's development and management, *id.* ¶ 8.  These included Snowdance Realty Company ("Realty"), Snowdance Ski Company ("Ski"), and Snowdance Hotel Company ("Hotel").  *Id.* ¶ 8.

On May 19, 2005, Snowdance obtained a $4.5 million loan from the Palisades Regional Investment Fund ("PRIF") (the "PRIF Loan") pursuant to a promissory note dated May 19, 2015 (the "Note").  *Id.* ¶ 9[2]; Counterclaim ¶ 48.  The PRIF Loan was secured by the buildings, improvements, and fixtures upon the Resort.  Complaint ¶ 9.  The Plausteiners personally guaranteed the PRIF Loan.  *Id.*; Counterclaim ¶ 49.

---

[1] The facts are drawn primarily from the Counterclaim, Dkt. 71 ("Counterclaim"), and the Complaint, Dkt. 1 ("Complaint").  For the purpose of resolving the motion to dismiss, the Court assumes all well-pleaded facts to be true and draws all reasonable inferences in favor of the plaintiff.  *See Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir. 2012).  The Court also considered the AFA, attached as Exhibit 1 to the Plausteiners' memorandum of law in support of their motion to dismiss the Complaint.  Dkt. 20, Ex. 1.  Consideration of the AFA is proper because, as the operative contract underlying plaintiff's claims, it is incorporated by reference in, and integral to, the Complaint and the Counterclaim.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–54 (2d Cir. 2002).

[2] Although the Complaint and Counterclaim refer to PRIF, the AFA and other documents indicate that the entity's full name is PRIF Ascutney, LLC.  *See, e.g.*, AFA at 1.

Around December 2007, Snowdance defaulted on the PRIF Loan and PRIF initiated foreclosure proceedings in Vermont state court.  Complaint ¶ 10; Counterclaim ¶ 54.  PRIF and Snowdance then entered into an agreement under which PRIF would refrain from enforcing its rights and remedies under the PRIF Loan subject to certain conditions ("Forbearance Agreement").  Complaint ¶ 11; Counterclaim ¶¶ 55–58.  The Forbearance Agreement gave the members of Snowdance about one year to satisfy the PRIF loan; the Plausteiners were required to pledge their Snowdance membership interests in favor of PRIF and agree to be personal guarantors of the PRIF Loan.  Counterclaim ¶¶ 57–58.

Around February 2008, however, Snowdance defaulted on the Forbearance Agreement and PRIF resumed the foreclosure proceedings in Vermont state court.  Complaint ¶¶ 12, 20.

### 2.    The Assignment to MFW and the AFA

Around October 2008, MFW purchased, and was assigned, the PRIF Loan.  *Id.* ¶ 14; Counterclaim ¶¶ 73–77.  MFW then entered into the AFA, titled "Amendment No. 1 to the Forbearance Agreement dated June 30, 2008."  Complaint ¶¶ 15–16; Counterclaim ¶ 78.[3]  The agreement extended the period of forbearance on the PRIF Loan until October 1, 2009. Complaint ¶ 16.

The AFA states that it was entered into "by and between" the following parties:

> MFW ASSOCIATES, LLC . . . (the "<u>Lender</u>"), who is the successor and assignee of PRIF ASCUTNEY, LLC ("PRIF"), and SNOWDANCE LLC . . . (the "<u>Borrower</u>"), STEVEN PLAUSTEINER . . . ,  SUSAN PLAUSTEINER . . . (each sometimes referred to herein as a "<u>Guarantor</u>" individually, jointly and severally as the "<u>Guarantors</u>"), SNOWDANCE SKI COMPANY, . . . SNOWDANCE HOTEL COMPANY, . . . SNOWDANCE REALTY COMPANY, . . . STEVEN PLAUSTEINER and SUSAN PLAUSTEINER, (collectively, the

---

[3] The AFA recites that Snowdance defaulted on the December 2007 forbearance agreement, and that MFW agreed to a second forbearance agreement dated June 30, 2008.  AFA ¶ 2.

"Pledgors", and together with the Borrower and the Guarantors, are
referred to herein as the "Debtor").

AFA at 1.  The AFA provides that it "shall be deemed incorporated into and made part of the

Transaction Documents."  *Id.* § 10; Counterclaim ¶ 81.  The AFA defines the Transaction

Documents to encompass the PRIF Loan and the associated promissory note, the agreement for

the sale of the PRIF Loan to MFW and the associated assignment, and "all instruments,

documents, mortgages, forbearance agreements and other agreements executed in connection

therewith or related thereto, and amendments modifications, or supplements thereto."  AFA ¶ 1.

At the time MFW purchased the PRIF Loan, the PRIF Loan had an unpaid principal

balance of $1.35 million.  Complaint ¶ 14.  Section 5(a) of the AFA provides that, to satisfy the

obligations under the PRIF Loan, "Debtor shall pay" to MFW, by October 1, 2009, the reduced

amount of $850,000.00, plus 20% interest calculated from the date of the agreement and the date

of payment, plus reasonable fees, costs, and expenses incurred by MFW as a result of

enforcement of the Transaction Documents between the date of the agreement and date of

payment.  AFA § 5(a); Complaint ¶ 17.  But, if the Debtor did not pay that reduced amount by

October 1, 2009, § 5(b) provides that MFW's agreement to accept the reduced balance would

become void, and "Debtor shall pay to [MFW] the entire outstanding Debt . . . which shall

become due and payable immediately," which includes "all accrued and unpaid interest thereon

to date, plus all fees, costs, and expenses."  AFA § 5(b); Complaint ¶ 18.  Section 5(b) provides

that "Debtor also acknowledges that it is obligated to pay any additional legal fees incurred by

[MFW] through the collection of the entire indebtedness owed by Debtor pursuant to the terms

of the Transaction Documents."  AFA § 5(b).

In addition to the costs and fees described in § 5, § 4 imposes additional obligations on

the Debtor regarding costs and fees.  It provides:  "The Debtor . . . jointly and severally agrees to

pay on demand all costs and expenses, if any (including . . . reasonable attorneys' fees and

expenses), in connection with the enforcement . . . of this Amendment."  *Id.* § 4.

Finally, two provisions in § 8 are relevant here.  Section 8(a) provides that the Debtor

"shall executed [sic] and deliver to [MFW] Limited Liability Membership Pledge Agreements

from Steven Plausteiner, Susan Plausteiner, [Ski], [Hotel], and [Realty] pledging all of the

limited liability common membership interests owned by each person or entity in Snowdance."

*Id.* § 8(a).  And § 8(e) provides that:

> [MFW] hereby releases Guarantors, Steven and Susan Plausteiner,
> from their obligations under the Transaction Documents and from
> any guaranty relating in any way to the Transaction Documents,
> including but not limited to, (i) the Guaranty dated May 19, 2005
> given by the Guarantors in favor of PRIF and (ii) the Limited
> Guaranty dated May 19, 2005 given by the Guarantors in favor of
> PRIF (together the "Guarantees").  The Guarantees are hereby
> terminated and of no further force or effect.  Furthermore, this
> release shall also apply to the mortgage deed granted by Guarantors
> to Lender for the real property situated at 701 Coaching Lane,
> Brownsville, Vermont, and Lender agrees to take all reasonable
> actions necessary to cause such mortgage deed to be released and
> for such release to be recorded in the appropriate governmental
> offices. This release shall only apply to Guarantors.

*Id.* § 8(e); Counterclaim ¶ 82.

### B.    MFW's Claims—and the Denial of the Plausteiners' Motion to Dismiss Them

#### 1.    MFW's Claims

On April 2, 2015, MFW filed its Complaint against the Plausteiners.  Dkt. 1.  It brings

one count for breach of contract under the AFA and seeks damages of not less than

$4,002,606.61.  Complaint ¶¶ 24–28.  The Complaint alleges, in substance, that after MFW

purchased the PRIF Loan and the PRIF Loan was assigned to MFW such that MFW possessed

all of PRIF's former rights, and after the parties entered into the AFA, the Plausteiners failed to

pay the amounts they owed to MFW under the AFA. *Id.* ¶¶ 14, 19. It alleges that AFA § 5(a) required the Plausteiners to pay $850,000, plus interest, before October 1, 2009, in full satisfaction of the amount owed under the PRIF Loan, and, alternatively, that AFA § 5(b) provides that if the Plausteiners failed to timely make the payment as required by § 5(a), then MFW's agreement to accept a reduced amount becomes nullified, obliging the Plausteiners to pay to MFW the entire amount of the outstanding debt on the PRIF Loan, with interest. *Id.* ¶¶ 17–18. MFW brought this lawsuit to collect the amount allegedly due under the AFA—the full outstanding amount of the PRIF Loan—that the Plausteiners failed to pay.

### 2.    The Plausteiners' Motion to Dismiss

On May 15, 2015, the Plausteiners answered the Complaint. Dkts. 6, 8. As affirmative defenses, they asserted, *inter alia*, that MFW had failed to state a claim and that its lawsuit was barred by the doctrines of collateral estoppel and res judicata. *E.g.*, Dkt. 6, ¶¶ 29, 33.

On June 3, 2015, the Plausteiners moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). Dkt. 19.[4] They argued that MFW's breach of contract claim was barred by *res judicata*, asserting that prior foreclosure proceedings in Vermont, in which MFW had foreclosed on assets securing the PRIF Loan, precluded their claims. Separately, they argued that MFW failed to state a claim for breach of contract because—as the Plausteiners read the AFA—the AFA expressly released them from all obligations to repay the PRIF Loan.

---

[4] A motion under Rule 12(b)(6) "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). The Plausteiners, however, answered the Complaint before moving to dismiss; therefore the proper vehicle for them was a motion under Rule 12(c) for judgment on the pleadings. *See* Fed. R. Civ. P. 12(c); Fed. R. Civ. P. 12(h)(2)(B); *In re Livent Sec. Litig.*, 193 F. Supp. 2d 750, 753 (S.D.N.Y. 2002). Because their motion could have been brought under FRCP 12(c), and because under that circumstance "the court simply treats the motion as if it were a motion to dismiss," *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 909 n.2 (2d Cir. 1988), the Court construed the Plausteiners' motion to dismiss as under Rule 12(c), *see id.*

After briefing and argument, on March 24, 2016, the Court denied the motion to dismiss in its entirety.  Dkt. 52.  The Court held that the proceedings in Vermont state court did not preclude MFW from seeking to establish the Plausteiners' personal liability under the AFA for the underlying PRIF Loan.  And, the Court held, dismissal of the breach of contract claim was not warranted because the AFA, including § 8(e), did not unambiguously release the Plausteiners from their liability for the underlying PRIF Loan in all respects.  *Id.*  Instead, the Court noted, although the AFA was expressly entered into by the Plausteiners in multiple capacities, AFA § 8(e) releases the Plausteiners from liability for the PRIF Loan in only one—in their capacity as guarantors.  *Id.*  Thus, the AFA's text favored MFW's argument that the release applies to the Plausteiners only in their capacity as guarantors.  Although discovery into the possible ambiguity of the AFA as to the scope of the release might prove warranted, the Court held, at the pleading stage, AFA § 8(e) cannot be read to globally release the Plausteiners.  *Id.*

On April 8, 2016, the Plausteiners filed a motion for reconsideration of the denial of their motion to dismiss, Dkt. 56, and, on April 26, 2016, a motion to stay discovery, Dkt. 61.  On April 27, 2016, the Court denied these motions.  Dkt. 63.

### C.     The Plausteiners' Counterclaim

On May 4, 2016, the Plausteiners moved for leave to amend their answer to add a counterclaim.  Dkt. 64.  On May 6, 2016, the Court granted such leave.  Dkt. 66.  On August 5, 2016, the Plausteiners filed an amended answer and the Counterclaim against MFW for fraudulent inducement.  Dkt. 71.

The counterclaim asserts that MFW's Purjes fraudulently induced the Plausteiners to enter into the AFA, by untruthfully promising them that he would not pursue further relief from them in any capacity.  As such, the counterclaim seeks effectively to achieve the same outcome

that the Plausteiners unsuccessfully pursued, in their motion to dismiss, when they urged the Court to construe the AFA to release them globally.

Specifically, the Plausteiners claim they were fraudulently induced into agreeing in the AFA to the terms of MFW's purchase of the PRIF loan.  Before that point, PRIF had sought $2.35 million on the loan, but Steven Plausteiner and Purjes negotiated with PRIF to discount the balance of the Note to $1.85 million.  Counterclaim ¶¶ 60–61.  Steven Plausteiner and Purjes agreed to use their personal funds to pay the $1.85 million to PRIF, of which Steven Plausteiner agreed to pay $1 million and Purjes agreed to pay $850,000.  *Id.* ¶¶ 62–64.  The Plausteiners allege that they and Purjes agreed that the Plausteiners' $1 million would be paid into Snowdance to reduce the balance of the PRIF loan to an $850,000 unsecured debt, which Purjes would pay if he could purchase the PRIF loan outright and take its first position mortgage.  *Id.* ¶¶ 65–70.

Central here, the Plausteiners allege that they agreed to these terms, and then entered into the AFA believing, from Purjes, that the agreement released them from *all* personal liability on the PRIF loan.  They allege that "Purjes agreed to release the Plausteiners from all of their personal liability to the PRIF Loan under the Transaction Documents" part of the PRIF loan.  *Id.* ¶¶ 67, 70; *see also id.* ¶ 71 ("Purjes agreed to the condition that the Plausteiners would be released from all personal liability under the Transaction Documents"); *id.* ¶ 72 ("Purjes and the Plausteiners agreed that, as long as the Plausteiners were removed from all personal liability for the PRIF Loan, the other companies, Snowdance Realty Company, Snowdance Hotel Company, and Snowdance Ski Company would remain liable for the PRIF Loan as 'Pledgors' pursuant to the PRIF 2005 Pledge Agreements and to a new pledge agreement to be drafted.").  The Plausteiners allege that, had they understood that they were not obtaining a global release, they

9

would not have contributed the $1 million to decrease the PRIF Loan debt, or entered into an agreement—the AFA—that gave them only a partial release.  *See id.* ¶ 85.  They accuse Purjes of falsely representing to them that the AFA's release of them would be global, *id.* ¶¶ 86–87, and assert that, in paying $1 million towards the PRIF loan and signing the AFA, they reasonably relied on Purjes's statement that they were achieving a global release.  *Id.* ¶ 88.

On August 12, 2016, MFW filed a motion to dismiss the counterclaim, Dkt. 72, arguing that the counterclaim does not state a claim and that it is time-barred, and filed a memorandum of law in support, Dkt. 73.  On August 19, 2016, the Plausteiners filed a memorandum of law in opposition, Dkt. 75, and, on August 26, 2016, MFW filed a reply, Dkt. 77.

## II.     Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."  *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)) (internal quotation marks omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  "[R]ather,

the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks, citation, and alteration omitted) (emphasis in *Arista Records*).

For claims alleging fraud, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard. Such claims must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a complaint must "allege facts that give rise to a strong inference of fraudulent intent." *Berman v. Morgan Keenan & Co.*, 455 F. App'x 92, 95 (2d Cir. 2012) (summary order) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). Specifically, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11 Civ. 7801 (PAE), 2012 WL 1231775, at *3 (S.D.N.Y. Apr. 12, 2012) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)). The purpose of the particularity requirement of Rule 9(b) is to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (quoting *O'Brien v. Nat'l Property Analyst Partners*, 936 F.2d 674, 676 (2d Cir. 1991)).

## III.    Discussion

The Plausteiners bring one counterclaim for fraudulent inducement, based on Purjes's oral statements prior to the execution of the AFA to the effect that the forthcoming agreement would release the Plausteiners from all personal liability on the PRIF Loan.

11

"To state a claim for fraudulent misrepresentation under New York law 'a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'" *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of New York*, 375 F.3d 168, 186–87 (2d Cir. 2004) (quoting *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)).

Significant here, New York law sets limits on the types of misrepresentations that can give rise to a cognizable such claim. Three related principles are relevant here.

First, the misrepresentation must be of a "material existing fact." *Urstadt Biddle Props., Inc. v. Excelsior Realty Corp.*, 65 A.D.3d 1135, 1137 (N.Y. App. Div. 2d Dept. 2009) (*citing Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 151 N.E.2d 833, 835 (N.Y. 1958)); *see also Gosmile, Inc. v. Levine*, 81 A.D.3d 77, 81 (N.Y. App. Div. 1st Dept. 2010) (same). "[A] representation of opinion or a prediction of something which is hoped or expected to occur in the future does not sustain an action to recover damages for fraud," *Coccia v. Liotti*, 70 A.D.3d 747, 756 (N.Y. App. Div. 2d Dept. 2010) (*citing Chase Invs., Ltd. v. Kent*, 256 A.D.2d 298, 299 (N.Y. App. Div. 2d Dept. 1998)).

Second, a party's misrepresentation that it intended to perform under a contract does not support a claim for fraudulent inducement. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19–20 (2d Cir. 1996) ("[I]intentionally-false statements . . . indicating [an] intent to perform under the contract . . . [are] not sufficient to support a claim of fraud under New York law."); *see also Lehman v. Dow Jones & Co., Inc.*, 783 F.2d 285, 294 (2d Cir. 1986) ("New York Courts have made it clear that a plaintiff may not circumvent the Statute of Frauds . . . by simply recasting his claim for breach of contract as an action for fraud." (quotation

omitted)).  Instead, to maintain a claim for fraudulent inducement separate from a breach of contract claim, a plaintiff must either "(i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."  *Bridgestone/Firestone*, 98 F.3d at 19–20.

Finally, when "there is a meaningful conflict between an express provision in a written contract and a prior alleged oral representation, the conflict negates a claim of reasonable reliance upon the oral representation."  *Urstadt Biddle Props., Inc.*, 65 A.D.3d at 1137 (quoting *Stone v. Schulz*, 231 A.D.2d 707, 707–08 (N.Y. App. Div. 2d Dept. 1996)).

These principles foreclose the Plausteiners' counterclaim for fraudulent inducement. Their claim is that Purjes, before the execution of the AFA, made fraudulent misrepresentations to the effect that, in the forthcoming agreement, the Plausteiners would be released from all personal liability on the PRIF Loan in exchange for their $1 million payment to Snowdance.

To the extent that the Plausteiners allege that the AFA in fact incorporates such a general release, their allegation is that Purjes falsely asserted beforehand that he would perform, in that he would abide by the AFA's global release and not pursue claims against them.  But under New York law, "a misrepresentation of future intent to perform under the contract" merges with the contract and is not separately actionable as fraud.  *See, e.g.*, *Gosmile, Inc.*, 81 A.D.3d at 81 ("To state a claim for fraudulent inducement, there must be a knowing misrepresentation of material present fact, which is intended to deceive another party and induce that party to act on it, resulting in injury. . . .  [A] misrepresentation of present facts, unlike a misrepresentation of future intent to perform under the contract, is collateral to the contract") (citations omitted); *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183–84 (2d Cir. 2007) ("New

York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of present fact that gives rise to a separate cause of action for fraudulent inducement."); *see also Intelligen Power Systems, LLC v. dVentus Technologies LLC*, No. 14 Civ. 7392 (PAE), 2015 WL 3490256, at *10–11 (S.D.N.Y. June 2, 2015) (representations of a manufacturer's present capacity may be actionable in fraud, but contractual promises regarding prospective performance are not) (collecting cases).

To the extent that the Plausteiners allege—consistent with the Court's assessment of the AFA's text—that the AFA did not effect a general release of the Plausteiners from the PRIF Loan, their claim is that Purjes inaccurately projected to them the terms of the as-yet-unexecuted AFA. This claim, too, is not actionable in fraud, for two reasons.

First, the Plausteiners do not dispute that the AFA is a valid contract that binds them as parties to it. Thus, any claim that they would have based on pre-execution discussions regarding the terms of the AFA merges with the contract. The Plausteiners are bound by the contract into which they are held to have entered. Conceivably, were the AFA held textually ambiguous as to the scope of the release, conversations among the contracting parties before the AFA's execution may be evidence of their contemporaneous intent, and thus germane to MFW's breach of contract claim. But they would not give to rise to a fraudulent inducement claim.

Second, the Plausteiners' claim that Purjes misrepresented the terms of a future agreement by definition fails to allege a misstatement of a *present* material fact. Indeed, however the AFA is read, the Plausteiners' counterclaim fails to allege the misstatement of a then-existing fact. All of Purjes's alleged statements are forward-looking: They concern Purjes's anticipation of what the AFA would provide and/or whether he would abide by it. Such claims do not sound in fraudulent inducement.

14

Accordingly, the Court grants MFW's motion to dismiss the Plausteiners' counterclaim. This ruling, of course, leaves the Plausteiners at liberty, in defending against MFW's breach of contract claim, to argue that, if the scope of the release under the AFA were held ambiguous, Purjes's alleged statements to them in connection with the negotiation of the AFA are relevant evidence of the parties' shared intentions as to that issue.

Finally, the Court notes the Plausteiners' fraudulent inducement claim has a second fatal flaw—it is untimely. Even if Purjes's statements to the Plausteiners before the execution of the AFA concerned material present facts of a sort that could support a fraudulent inducement claim, these statements were made and the AFA was entered into in October 2008. Counterclaim ¶¶ 74, 78. Under New York law, a cause of action for fraud must be brought within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8). The Plausteiners brought their counterclaim in August 2016, nearly two years after the six-year limitations period expired in October 2014. Thus, the counterclaim is timely only if the Plausteiners could not discovered MFW's fraud before August 2014. The Plausteiners argue that they could not have discovered that Purjes's October 2008 statements were fraudulent until April 2015, when MFW brought this lawsuit pursuing payment from them of the outstanding debt on the PRIF Loan. Counterclaim ¶¶ 70–71, 74, 84–89.

That argument does not follow. Purjes's statements were made by, and the AFA was entered into in, October 2008. The Plausteiners, as parties to the AFA, are chargeable with knowledge of the text of the AFA, including the language in it that might leave room for a future collection action against them. To the extent the AFA left open a legal route for MFW to pursue a future such action against the Plausteiners, and thereby contradicted Purjes's pre-AFA

15

statement that it would not, the Plausteiners were reasonably on notice of this in October 2008. MFW only later decided to exercise the rights it believed it had against the Plausteiners under the AFA, but the Plausteiners were aware, at all times beginning in October 2008, of the provisions of that agreement.

## CONCLUSION

For the foregoing reasons, the Court grants MFW's motion to dismiss the Plausteiners' counterclaim. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 72.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 16, 2017
       New York, New York

16