UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                  :

MFW ASSOCIATES, LLC,
                                                  :

                        Plaintiff,           :

                                                    :

             -v-                          :

                                                    :

STEVEN PLAUSTEINER and SUSAN PLAUSTEINER,  :

                                                    :

                        Defendants.      :

                                                    :
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: _6-2-17_

15 Civ. 2513 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

      This decision resolves competing motions for summary judgment in this breach of

contract action. The action arose from the failure of borrowers, including defendants Steven and

Susan Plausteiner (the "Plausteiners"), to pay money allegedly owed in connection with loans

made to develop a now-closed Vermont ski resort, the Ascutney Mountain Resort (the "Resort").

This decision also resolves the motion by plaintiff MFW Associates, LLC ("MFW") for an order

of attachment of certain real property in Vermont owned by the Plausteiners, to serve as security

in the event a judgment were entered against them.

      MFW brings a single claim for breach of contract, based on the Plausteiners' failure to

pay monies allegedly owed to MFW under Amendment No. 1 to the Forbearance Agreement

dated June 30, 2008 ("AFA"). The Court earlier denied the Plausteiners' motion to dismiss.

That motion had primarily been based on the AFA's text; the Court rejected the Plausteiners'

claim that it unambiguously released them from their duty, in all capacities, to pay the debt on

which MFW is suing them. In support of that motion, the Plausteiners belatedly—in their reply

brief—had also sought dismissal on the ground of claim preclusion (*res judicata*). They based

that claim on a lawsuit that MFW had brought earlier in Vermont state court; they argued that MFW's bid there for a deficiency judgment precluded its breach of contract claim here. After a close analysis of Vermont law regarding deficiency judgments, the Court rejected that claim.

The parties now cross-move for summary judgment. As on the motion to dismiss, the cross-motions implicate two sets of issues. The first is whether the AFA, either textually or as now supplemented by extrinsic evidence, establishes that the Plausteiners owe the debt in question, as MFW argues, or releases them from the duty to pay that debt, as the Plausteiners argue. The second is whether MFW's lawsuit here is barred by principles of *res judicata*, as the Plausteiners argue, or not, as MFW argues. Significant here, on the cross-motions, the Plausteiners have changed their basis for arguing *res judicata*. They now base that claim on the facts that, in the earlier Vermont lawsuit, MFW brought a breach of contract claim paralleling its claim here, and that that claim was dismissed with prejudice pursuant to an agreed-upon stipulation.

For the following reasons, the Court holds that summary judgment to the Plausteiners is warranted on the basis of *res judicata*. The Court therefore does not reach the parties' competing arguments based on the text of the AFA, and denies MFW's motion to attach as moot.

## I.    Background[1]

---

[1] The Court draws its account of the underlying facts from the parties' respective submissions on their cross-motions for summary judgment, including their Joint Stipulation of Facts, Dkt. 86 ("JSF"), and its attached exhibits; the exhibits attached to the Plausteiners' memorandum of law in support of their motion, Dkt. 95 ("Plausteiner Memo"); the Affidavit of Dan Purjes in support of MFW's motion, Dkt. 109 ("Purjes Aff."); MFW's Rule 56.1 statement of undisputed material facts in support of its motion, Dkt. 110 ("MFW 56.1"), and its attached exhibits; the exhibits attached to the Plausteiners' reply memorandum of law in support of their motion and in opposition to MFW's motion, Dkt. 118 ("Plausteiner Reply"); and the Affidavit of Steven Plausteiner in support of the Plausteiners' motion, Dkt. 119 ("Plausteiner Aff."). Citations to a party's Rule 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence and

### A. Factual Background

#### 1. History of the Resort and the Loans Made to It

In 1993, the Plausteiners purchased the Resort, a 750-acre ski and vacation resort in Brownsville, Vermont, at a foreclosure auction. JSF ¶ 1. Between 1993 and 1997, they were the sole owners and operators of the Resort; in 1997, they sought to improve and expand the resort and sought outside financing to do so and, to that end, formed Snowdance LLC ("Snowdance"). *Id.* ¶¶ 3–5. The Plausteiners were majority owners and the managers of Snowdance and were its sole officers and managers until July 2010. *Id.* ¶ 6. They were also the majority members of Snowdance Realty LLC ("Realty"), Snowdance Ski Company, LLC ("Ski"), and Snowdance Hotel Company, LLC ("Hotel"), all formed in 1997, each of which were minority owners of Snowdance. *Id.* ¶ 7. The Plausteiners controlled Realty, Ski, and Hotel at all relevant times. *Id.* Dan Purjes initially acquired a 25% interest in Snowdance pursuant to a membership agreement dated May 7, 1998. *Id.* ¶ 8.

Snowdance obtained various loans to help it make improvements to the Resort. In May 2000, Snowdance sought to purchase a Garaventa CTEC High-Speed Quad Chairlift (the "Lift").

---

not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in a statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The Court draws upon the materials submitted as part of the briefing on MFW's motion to attach when helpful to aid in setting forth the background of this case. In considering that motion, the Court reviewed various submissions, including the exhibits attached to MFW's memorandum of law, Dkt. 90; the Affidavit of Dan Purjes in support of MFW's motion, Dkt. 93; the Affidavit of Steven Plausteiner in opposition, Dkt. 99; and the Reply Affidavit of Dan Purjes in support of the motion, Dkt. 102.

*Id.* ¶ 10.  The purchase price of the Lift was $2.4 million but Snowdance was able to finance only $1.4 million.  *Id.*  To pay for the Lift, Purjes loaned Snowdance a $1 million bridge loan, evidenced by a promissory note dated May 18, 2000 and executed by Snowdance.  *Id.* ¶ 11.

### 2.      The $4.5 Million PRIF Loan and Snowdance's Default

Later, Snowdance obtained a $4.5 million loan from the Palisades Regional Investment Fund (PRIF Ascutney, LLC) (the "PRIF Loan"), pursuant to a promissory note dated May 19, 2005.  *Id.* ¶¶ 14–15.  The Plausteiners personally guaranteed the PRIF Loan and agreed to put a mortgage on their personal residence on Coaching Lane in Brownsville, Vermont as additional collateral for that loan, which was memorialized in a Guaranty Agreement dated May 19, 2005.  *Id.* ¶ 16.  PRIF also required the Plausteiners (along with Realty, Ski, and Hotel) to pledge their membership interests in Snowdance to PRIF in the event of a default on the PRIF Loan.  *Id.* ¶ 18.  This agreement was memorialized in a Financial Interest Pledge and Security Agreement dated May 19, 2005 (the "Pledge Agreement").  *Id.*  The PRIF Loan documents included documents totaling 457 pages (the "Transaction Documents").  *Id.* ¶ 19.  Under a separate agreement dated May 19, 2005 with a different lender, Textron Financial Corporation ("Textron"), PRIF received a first priority mortgage on the Resort's real property.  *Id.* ¶¶ 12–13, 20.

In or around December 2007, Snowdance defaulted on its obligations under the PRIF Loan and PRIF began foreclosure proceedings.  *Id.* ¶ 21.  PRIF then agreed to forbear enforcement of its rights in connection with Snowdance's default for a period of time; this was reflected in a Forbearance Agreement dated December 2007.  *Id.* ¶ 22.  In or around February 2008, however, Snowdance defaulted on the Forbearance Agreement, and PRIF resumed its foreclosure action on the PRIF Loan.  *Id.* ¶ 23.  But, on June 30, 2008, Snowdance entered into a second Forbearance Agreement with PRIF.  *Id*. ¶ 24.

### 3.      The Assignment to MFW and the AFA

In or around September 2008, Steven Plausteiner met with Purjes at Purjes's home in New York City to discuss ways to pay off the PRIF Loan. *Id.* ¶ 27. The balance of the PRIF Loan at that time was about $2.35 million but had been negotiated to $1.85 million on the condition that the amount be paid immediately in cash. *Id.* ¶ 28. Purjes and Steven Plausteiner then reached an understanding about purchasing the remaining balance of the PRIF Loan. *Id.* ¶ 29.

Under this agreement, the Plausteiners agreed to pay $1 million to PRIF, in exchange for which the Plausteiners would receive a preferred membership interest of $1 million that would be senior to all other equity interests in Snowdance. *Id.* ¶ 30. Purjes agreed to purchase the remainder of the PRIF Loan through MFW, a company he would establish for this purpose, on the condition that MFW would take the place of PRIF and assume its first priority lienholder position with respect to the Resort's real property, along with holding a senior preferred equity position in Snowdance. *Id.* ¶ 31. As a result, the Plausteiners' payment to PRIF was unsecured, instead being in exchange for a senior preferred equity position in Snowdance. *Id.* The Plausteiners demanded, however, as consideration for the payment to PRIF, that MFW release the mortgage on the Plausteiners' personal residence on Coaching Lane, which had been part of the security for the PRIF Loan, and MFW agreed to do this. *Id.* ¶ 32.

To execute this agreement, Purjes formed MFW in October 2008. *Id.* ¶ 34. At all relevant times since, Purjes has served as its managing member. *Id.* The Plausteiners, in October 2008, paid $1 million to PRIF to reduce the balance of the PRIF Loan. *Id.* ¶ 35. And, on October 10, 2008, MFW purchased the PRIF Loan and PRIF's interest was assigned to it such that MFW stood in the shoes of PRIF with respect to the PRIF Loan and the Forbearance

Agreement. *Id.* ¶ 36. In connection with MFW's purchase of the PRIF Loan, as a condition of MFW's forbearance, MFW drafted and entered into new pledge agreements dated October 10, 2008 with the Plausteiners and with Realty, Hotel, and Ski, each of whom pledged their equity interests to secure the PRIF Loan. *Id.* ¶ 37; MFW 56.1 ¶ 24 & Ex. 10 (Dkt. 110-10) (the "MFW Pledge Agreements").

On October 10, 2008, MFW, now the assignee of the obligations due under the PRIF Loan, entered into a new forbearance agreement with Snowdance, the Plausteiners, Realty, Hotel, and Ski, titled "Amendment No. 1 to the Forbearance Agreement dated June 30, 2008" (the "AFA"). *Id.* ¶ 38. The AFA—a key document here—extended the forbearance period for payments due under the PRIF Loan to October 1, 2009. *Id.* ¶ 39 & Ex. 1 ("AFA").

The AFA states that it was entered into "by and between" the following parties:

> MFW ASSOCIATES, LLC . . . (the "<u>Lender</u>"), who is the successor and assignee of PRIF ASCUTNEY, LLC ("PRIF"), and SNOWDANCE LLC . . . (the "<u>Borrower</u>"), STEVEN PLAUSTEINER . . . , SUSAN PLAUSTEINER . . . (each sometimes referred to herein as a "<u>Guarantor</u>" individually, jointly and severally as the "<u>Guarantors</u>"), SNOWDANCE SKI COMPANY, . . . SNOWDANCE HOTEL COMPANY, . . . SNOWDANCE REALTY COMPANY, . . . STEVEN PLAUSTEINER and SUSAN PLAUSTEINER, (collectively, the "<u>Pledgors</u>", and together with the Borrower and the Guarantors, are referred to herein as the "<u>Debtor</u>").

AFA at 1. The AFA provides that it "shall be deemed incorporated into and made part of the Transaction Documents." *Id.* § 10. The AFA defines the Transaction Documents to encompass the PRIF Loan and the associated promissory note, the agreement for the sale of the PRIF Loan to MFW and the associated assignment, and "all instruments, documents, mortgages, forbearance agreements and other agreements executed in connection therewith or related thereto, and amendments modifications, or supplements thereto." AFA ¶ 1.

Section 5(a) of the AFA provides that, to satisfy the obligations under the PRIF Loan, "Debtor shall pay" to MFW, by October 1, 2009, the reduced amount of $850,000.00, plus 20% interest calculated from the date of the agreement and the date of payment, plus reasonable fees, costs, and expenses incurred by MFW as a result of enforcement of the Transaction Documents between the date of the agreement and date of payment.  AFA § 5(a).  But, if the Debtor did not pay that reduced amount by October 1, 2009, § 5(b) provides that MFW's agreement to accept the reduced balance would become "null and void," and "Debtor shall pay to [MFW] the entire outstanding Debt . . . which shall become due and payable immediately," which includes "all accrued and unpaid interest thereon to date, plus all fees, costs, and expenses."  AFA § 5(b).  Section 5(b) provides that "Debtor also acknowledges that it is obligated to pay any additional legal fees incurred by [MFW] through the collection of the entire indebtedness owed by Debtor pursuant to the terms of the Transaction Documents."  AFA § 5(b).

The AFA also released the mortgage on the Plausteiners' personal residence that had served as part of the security for the PRIF Loan.  AFA § 8(e).  The AFA also called for the execution of the MFW Pledge Agreements, under which the Plausteiners and Realty, Hotel, and Ski would pledge their membership interests in Snowdance to MFW:  Section 8(a) provides that the Debtor "shall executed [sic] and deliver to [MFW] Limited Liability Membership Pledge Agreements from Steven Plausteiner, Susan Plausteiner, [Ski], [Hotel], and [Realty] pledging all of the limited liability common membership interests owned by each person or entity in Snowdance."  *Id.* § 8(a).  Additionally, § 8(e) provides that

> [MFW] hereby releases Guarantors, Steven and Susan Plausteiner, from their obligations under the Transaction Documents and from any guaranty relating in any way to the Transaction Documents, including but not limited to, (i) the Guaranty dated May 19, 2005 given by the Guarantors in favor of PRIF and (ii) the Limited Guaranty dated May 19, 2005 given by the Guarantors in favor of

> PRIF (together the "Guarantees"). The Guarantees are hereby
> terminated and of no further force or effect. Furthermore, this
> release shall also apply to the mortgage deed granted by Guarantors
> to Lender for the real property situated at 701 Coaching Lane,
> Brownsville, Vermont, and Lender agrees to take all reasonable
> actions necessary to cause such mortgage deed to be released and
> for such release to be recorded in the appropriate governmental
> offices. This release shall only apply to Guarantors.

*Id.* § 8(e).

### 4. Snowdance's Default on Its Obligations Under the AFA and MFW's Reinstitution of the Vermont Foreclosure Action

Snowdance later defaulted on its payments due under the AFA. *See* JSF ¶ 46. MFW

then reinstituted the foreclosure proceeding previously begun by PRIF in Vermont state court

(the "Vermont Foreclosure Action"). *Id.* The original PRIF complaint and PRIF's or MFW's

subsequent complaints named Snowdance and others as defendants; the Plausteiners were not

ever named as defendants. *See* MFW 56.1, Exs. 7, 11–13.

On January 25, 2010, MFW filed a Supplemental Complaint in the Vermont Foreclosure

Action, in which it sought to foreclose on the membership interests in Snowdance pledged in the

MFW Pledge Agreements by the Plausteiners, Realty, Hotel, and Ski, and, as such, named the

Plausteiners and Realty, Hotel, and Ski as defendants. JSF ¶ 47 & Ex. 2 ("Supplemental

Complaint"). The Supplemental Complaint sought a court order for a judicial sale of the pledged

membership interests. It also alleged that if the sale of the LLC interests in Snowdance was less

than the debt those interests secure, then MFW would be entitled to a deficiency judgment

against the "Guarantors," which the Supplemental Complaint had defined collectively to include

the Plausteiners, Realty, Hotel, and Ski. *Id.* ¶¶ 48–50. The Supplemental Complaint also

brought a claim for breach of contract of the AFA. That claim alleged that, "By failing to pay

when due, Snowdance LLC is in breach of [the AFA] and the [original Forbearance Agreement

with PRIF]; it further alleged that, "By failing to pay when due, Guarantors [defined to include the Plausteiners] are in breach of their Pledge Agreements [defined as the MFW Pledge Agreements executed in connection with the AFA]." Supplemental Complaint ¶¶ 19, 24–25. MFW further alleged in its breach of contract count that, "As a result of the breaches, [MFW] has suffered damages. Moreover, [MFW] is now entitled to foreclose on the property described in the Pledge Agreements [the Plausteiners' and Realty's, Hotel's, and Ski's LLC equity interests in Snowdance]." *Id.* ¶¶ 19, 26. As relief, MFW sought in the Supplemental Complaint "compensatory damages" as well as foreclosure and a deficiency judgment. *Id.* at 6–7 (Claims for Relief). MFW also sought, as relief, "[a] declaratory judgment that Defendants have defaulted on their obligations under [the AFA]." *Id.* at 6 ¶ A. (Claims for Relief).

In sum, the Supplemental Complaint, although styled as "an action to foreclose on membership interests in Snowdance LLC held by [Realty], [Ski], [Hotel], Steven Plausteiner, and Susan Plausteiner (collectively, the 'Guarantors')," *id.* ¶ 1, in fact brought three counts: (1) for breach of the AFA, seeking damages, a declaratory judgment of defendants' default, and foreclosure, *id.* ¶¶ 23–26; (2) for foreclosure, seeking a judicial sale of the membership interests in Snowdance, *id.* ¶¶ 27–30; and (3) for a deficiency judgment in the circumstance that "the sale of the LLC interests in Snowdance is less than the amount of the debt secured by the guarantees then [MFW] will be entitled to a deficiency against the Guarantors," *id.* ¶¶ 31–32.

On or about July 1, 2010, the Plausteiners resigned as managing members of Snowdance. JSF ¶ 50. On July 27, 2010, Judge Cohen of Vermont Superior Court approved a "Stipulated Order Approving Plaintiff's Sale of Snowdance LLC Membership Interests," a corrected version of which was approved by Judge Cohen on October 8, 2010. *Id.* ¶¶ 51–52 & Ex. 3. This Stipulated Order permitted, as commercially reasonable under Vermont law, a private sale of the

Plausteiners' and Realty's, Hotel's, and Ski's ownership interests in Snowdance to another company, UTVT Holdings, Inc. ("UTVT"), for $100, "[i]n light of the significant amounts owed by Snowdance LLC to its creditors including MFW," *id.*, Ex. 3 ¶ 3.  The Stipulated Order specifically limited itself to the disposition of those interests.  It noted that MFW continued to pursue, in the Vermont Foreclosure Action, a deficiency judgment against the Plausteiners and the other parties understood as the "debtor" in the AFA.  *See id.* ¶ 5.

On November 24, 2010, Judge Cohen denied MFW's motion for summary judgment in the Vermont Foreclosure Action.  JSF ¶¶ 53–54 & Ex. 4.  On January 21, 2011, Snowdance, then owned by UTVT, sought to sell the Lift, making a motion in the Vermont Foreclosure Action to do so.  Plausteiner Memo, Ex. 14 (Dkt. 95-17).  On January 21, 2011, MFW assented to the sale of the Lift, noting that it asserted it believes it is entitled to the proceeds from the sale of the Lift, as a first mortgagee and first security interest holder, and assented to the proceeds being held by the court or in escrow pending the court's determination of who is entitled to the proceeds.  *Id.*, Ex. 15 (Dkt. 95-18).  On February 2, 2011, however, the Plausteiners filed an objection to Snowdance's motion to sell the Lift, contending that Snowdance's claim to sell the Lift for $1.55 million "would gut the value of the Ascutney Resort," that the Lift was worth significantly more, and that "[t]he Ascutney resort is still viable, and could be operated, as long as it has adequate lifts.  The motion to sell removes that possibility." *Id.*, Ex. 16 (Dkt. 95-19 at 3–4).

Later, MFW entered into an agreement with Snowdance, the Plausteiners, and Realty, Hotel, and Ski" entitled "Joint Stipulation Regarding Motion to Sell Lift and Motion for Preliminary Injunction" dated February 15, 2011.  JSF ¶ 54 & Ex. 5 (the "Joint Stipulation").  The Joint Stipulation provided for the Plausteiners to withdraw their objection to Snowdance's motion to sell the Lift and instead consented to the sale of the Lift as set forth in that motion.

Joint Stipulation ¶ 1.  The parties also agreed in the Joint Stipulation that "[t]he Supplemental Complaint filed in this action shall be dismissed with prejudice."  *Id.* ¶ 3.  On March 21, 2011, Judge Cohen issued an order approving the Joint Stipulation.  It granted Snowdance's motion to sell the Lift in accordance with the terms of the Joint Stipulation.  The order stated that it was "based on all parties' agreement in written stipulation, in accordance with the terms of that stipulation."  JSF ¶ 55 & Ex. 6.

Foreclosure proceedings continued for the mortgage on the other collateral in the Resort securing the PRIF Loan.  On August 14, 2013, Judge Cohen issued a "Judgment Order and Decree of Foreclosure by Judicial Sale" in favor of MFW.  *Id.* ¶ 57 & Ex. 7 ("Foreclosure Judgment Order").  This order noted that after a hearing on July 16, 2013 regarding "amounts due and priority of liens and security interests," MFW and Snowdance "stipulated to the amounts due" and Judge Cohen had approved those amounts and entered judgment in those amounts. Foreclosure Judgment Order at 1.  As such, the Foreclosure Judgment Order provided for a judgment that Snowdance owed MFW a total of $5,224,187.61, constituted by, *inter alia*, $1,320,903.76 in principal and $2,975,762.40 in interest, with $102.435.05 in legal fees.  *Id.* at 2. The Foreclosure Judgment Order provided for a roughly 30-day period for Snowdance, Realty (as successor in interest to Textron), Ski, Hotel, the Plausteiners, Purjes, and three other minority owners of Snowdance to redeem the judgment in full.  After a judgment of foreclosure was entered in favor of MFW, MFW, on or about November 6, 2013, filed a Motion for Order of Confirmation of Sale.  *Id.* ¶ 58 & Ex. 8.  The motion stated that a "public sale of the lands and premises subject to this foreclosure action" had occurred two days earlier, on November 4, 2013, and that the highest bidder in the auction had been MFW, which bought the foreclosed property

for $1.5 million. *Id.*, Ex. 8 at 1–2. The motion also stated that MFW "dismisses its claims for judgment for deficiency." *Id.* at 2.

On November 19, 2013, Judge Cohen entered an "Order of Confirmation of Sale." *Id.* ¶ 59 & Ex. 9 ("Confirmation Order"). That order opened as follows: "This foreclosure action was filed by Complaint dated March 11, 2008, by MFW ASSOCIATES, LLC's predecessor [in] interest to PRIF ASCUTNEY, LLC, against above named defendants," which the caption listed as Snowdance, Realty (successor in interest to Textron), Purjes, Hotel, Ski, the Plausteiners, and the three other minority equity holders of Snowdance. Confirmation Order at 1. The Confirmation Order continued by noting "[s]ince no defendant redeemed their interest in the subject lands and premises, a public auction sale of the subject lands and premises was held on November 4, 2013," *id.*, and that MFW "was the high bidder at the public sale," *id.* ¶ 2. The Confirmation Order then specified the lands, premises, fixtures, and equipment foreclosed on, and then stated that the interests of the named defendants in the subject lands and premises had been foreclosed upon, such that "there is no party defendant whose interest in the subject lands and premises is superior to the interest of [MFW]." *Id.* ¶¶ 3–5. It noted that "the judgment indebtedness as of the date of the sale is $5,296,648.50. The winning bid was $1,500,000.00. There is no surplus for distribution." *Id.* ¶ 6. The Confirmation Order then specified, "Plaintiff waives any deficiency claim," and Judge Cohen added a handwritten note, "—However this waiver excludes the Plaintiff's award as a priority lien holder of funds currently being held in escrow from the sale of chairlift. *See* Nov. 1 2013 order. [Initialed] WDC." *Id.* ¶ 7. The Confirmation Order then confirmed the sale. *Id.* ¶ 7.c.

**B.    This Litigation**

**1.    MFW's Claims**

On April 2, 2015, MFW filed its Complaint in this Court against the Plausteiners.  Dkt. 1 ("Complaint").  It sued in federal court based on diversity jurisdiction, pleading that, for diversity jurisdiction purposes, MFW is a citizen of Vermont, Utah, and New York, and the Plausteiners are citizens of Maine.  Complaint ¶¶ 1–2; Dkt. 33 ¶¶ 1–4 ("Supplemental Statement Concerning Jurisdiction").  It alleged that venue is proper in this district because a substantial part of the events giving rise to MFW's claims occurred in this district, including negotiations that led to the AFA between Steven Plausteiner and Purjes at Purjes's New York City home.  *Id.* ¶¶ 5, 13.

MFW's Complaint brings one count for breach of contract under the AFA and seeks damages and costs of not less than $4,002,606.61.  *Id.* ¶¶ 24–28.  MFW alleges, in substance, that after MFW purchased the PRIF Loan and the PRIF Loan was assigned to MFW such that MFW possessed all of PRIF's former rights, and after the parties entered into the AFA, the Plausteiners then failed to pay the amount they owed to MFW under the AFA.  *Id.* ¶¶ 14, 19.  It alleges that (1) AFA § 5(a) required the Plausteiners to pay $850,000, plus interest, before October 1, 2009, in full satisfaction of the amount owed under the PRIF Loan, and, alternatively, that (2) under AFA § 5(b), if the Plausteiners failed to timely make the payment as required by § 5(a), then MFW's agreement to accept a reduced amount became nullified, obliging the Plausteiners to pay to MFW the entire outstanding debt due on the PRIF Loan.  *Id.* ¶¶ 17–18.  MFW's suit thus sought to collect the amount allegedly due under the AFA—the full outstanding amount of the PRIF Loan—that the Plausteiners failed to pay.

### 2.    The Plausteiners' Motion to Dismiss

On May 15, 2015, the Plausteiners answered.  Dkts. 6, 8.  They asserted as affirmative defenses, *inter alia*, that MFW had failed to state a claim and that its lawsuit was barred by the doctrines of collateral estoppel and *res judicata*.  *E.g.*, Dkt. 6, ¶¶ 29, 33.

On June 3, 2015, the Plausteiners moved to dismiss, making two arguments.  Dkt. 19.[2] First, although not pursuing the point in their opening brief, they ultimately argued that MFW's breach of contract claim was barred by *res judicata*.  They argued that the Vermont foreclosure proceedings, in which MFW had foreclosed on assets securing the PRIF Loan, precluded MFW's current claim.  This was so, they argued, because (1) the Vermont Foreclosure Action resulted in a final adjudication on the merits via the dismissal of the Supplemental Complaint with prejudice pursuant to the Joint Stipulation and (2) MFW's claim here—that the Plausteiners are personally liable on the debt due under the AFA—arose from the same events.  The Plausteiners argued that the Supplemental Complaint raised the issue of whether they were personally liable under the AFA, and that MFW forewent that claim when it agreed to dismissal of the Supplemental Complaint with prejudice.  And, the Plausteiners argued, even if MFW's claims here had not raised in the Vermont action, they should have been.  Second, on the merits, the Plausteiners argued that MFW failed to state a claim for breach of contract, because, as the Plausteiners read the AFA, it expressly released them from all obligations to repay the PRIF Loan.

---

[2] The Plausteiners styled their motion as under Federal Rule of Civil Procedure 12(b)(6), but this was incorrect, because such a motion "must be made before pleading if a responsive pleading is allowed," Fed. R. Civ. P. 12(b), whereas the Plausteiners had answered the Complaint before moving to dismiss.  The proper motion for them therefore was for judgment on the pleadings under Rule 12(c).  *See* Fed. R. Civ. P. 12(c); Fed. R. Civ. P. 12(h)(2)(B); *In re Livent Sec. Litig.*, 193 F. Supp. 2d 750, 753 (S.D.N.Y. 2002).  Because their motion could have been brought under Rule 12(c), and because a court may "simply treat[] the motion as if it were a motion to dismiss," *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 909 n.2 (2d Cir. 1988), the Court construed the Plausteiners' motion as under Rule 12(c), *see id.*

MFW responded that the Vermont Foreclosure Action did not preclude its claim here because it was a foreclosure action. Under Vermont law, MFW noted, such an action does not preclude a later action on the underlying debt, whether brought as a deficiency claim or a claim for breach of contract. MFW argued that it had not litigated the Plausteiners' personal liability on the debt, and that the Joint Stipulation did not preclude such claims. MFW further argued that the foreclosure in Vermont was against property held by Snowdance, not by the Plausteiners, so the waiver of deficiency claims in the Confirmation Order barred only such claims against Snowdance. On the merits, MFW also countered the Plausteiners' reading of the AFA to release them from all liability.

On March 24, 2016, the Court, in a lengthy decision, denied the Plausteiners' motion to dismiss on both grounds. Dkt. 52 ("MTD Decision"). As to *res judicata,* the Court held that (1) the Supplemental Complaint and the Joint Stipulation came close to, but ultimately did not, satisfy *res judicata* because there had never been a judicial sale of the pledged collateral that could make a resulting deficiency claim possible, and (2) the Foreclosure Judgment Order and Confirmation Order waived deficiency claims only against Snowdance, not against the Plausteiners. As to the AFA, the Court held that the AFA did not unambiguously release the Plausteiners from all liability on the PRIF Loan. Instead, the Court noted, the Plausteiners had entered into the AFA in multiple capacities, but AFA § 8(e) appeared to release them from liability on the PRIF Loan in only one: as loan guarantors. As a result, at the pleading stage, AFA § 8(e) could not be read to release the Plausteiners from global liability on that loan. The Court left open the possibility of discovery to explore any possible ambiguity on this point.[3]

---

[3] On May 4, 2016, the Plausteiners moved for leave to add a counterclaim, Dkt. 64, which, on May 6, 2016, the Court granted, Dkt. 66; on August 2, 2016, the Plausteiners filed an amended answer and counterclaim against MFW for fraudulent inducement, Dkt. 71. On August 12,

### C.    The Motions for Summary Judgment

On September 8, 2016, the Court set a schedule for summary judgment briefing.  Dkt. 81, later modified at the parties' request, Dkt. 105.  On October 13, 2016, MFW and the Plausteiners filed the JSF, Dkt. 86, which attached exhibits.  On October 28, 2016, the Plausteiners filed their motion for summary judgment, Dkt. 94, including the Plausteiner Memo, Dkt. 95, in support, which attached various exhibits.  On November 21, 2016, MFW filed its motion and opposition to the Plausteiners' motion, Dkt. 107, and included, in support, a memorandum of law, Dkt. 108 ("MFW Memo"), and the Purjes Aff., Dkt. 109, and the MFW 56.1, Dkt. 110, which attached various exhibits.  On December 9, 2016, the Plausteiners filed the Plausteiner Reply in support of their motion and in opposition to MFW's motion, Dkt. 118, and attached several exhibits, and filed the Plausteiner Aff., Dkt. 119.  On December 19, 2016, MFW filed a reply.  Dkt. 121.

The Plausteiners primarily argue for summary judgment based on *res judicata*, although they separately make an argument for release by the AFA.  Significantly, the Plausteiners have refined their *res judicata* argument.  They now focus on the fact that MFW—separate and apart from its claims for foreclosure and for a deficiency judgment—brought a breach of contract claim in the Supplemental Complaint in Vermont, based on the AFA, which was dismissed with prejudice in Vermont.  Because MFW here sues the Plausteiners for damages for breach of the AFA, they argue, *res judicata* bars this case.  The Plausteiners separately pursue *res judicata* on the ground that the pledged collateral (the membership interests in Snowdance) had in fact been

---

2016, MFW filed a motion to dismiss the counterclaim, *see* Dkts. 72, 77, which the Plausteiners opposed, Dkt. 73.  On March 16, 2017, the Court granted MFW's motion to dismiss the counterclaim, because it failed to allege misrepresentations of present fact, as opposed to a future intention not to perform, and because it was untimely.  Dkt. 123.

sold by the time of the Confirmation Order. Thus, they argue, dismissal of MFW's deficiency claim can have preclusive effect under Vermont law.

MFW counters that the Plausteiners have waived any right to pursue *res judicata* based on theories not raised in the motion to dismiss, such as based on MFW's breach of contract claim in Vermont. And, MFW argues, the Plausteiners' bid for *res judicata* based on the dismissal in Vermont of MFW's deficiency claim fails substantially for the reasons given by the Court in denying the motion to dismiss. The deficiency claim, MFW argues, was not ripe at the time the Supplemental Complaint was dismissed with prejudice, because the foreclosure sale of the collateral that secured the AFA had not yet occurred, and under Vermont law, a claim for a deficiency judgment cannot be brought until the existence and amount of the deficiency are determined by sale of the collateral after foreclosure. Moreover, MFW argues, the amount of a deficiency judgment could not have been determined at that time because various other collateral remained to be sold. MFW separately seeks summary judgment in its favor based on its construction of the AFA to maintain, not release, the Plausteiners' liability for the PRIF Loan in their capacity as a "Debtor."

## II.    Discussion

The Plausteiners seek summary judgment mostly based on *res judicata*. As the parties appear to agree, this issue can be resolved on summary judgment, as it is based on the record of the Vermont litigation, which has now been presented more fully to this Court. For the reasons that follow, the Court holds that the Plausteiners are entitled to judgment as a matter of law based on their reformulated theory of *res judicata*, which relies on the fact that MFW earlier brought a breach of contract claim in Vermont that was dismissed with prejudice. The Court thus has no

occasion to revisit or to resolve the Plausteiners's alternative grounds for claiming *res judicata,* or to resolve the parties' competing arguments for summary judgment based on the AFA.

### A.     Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant also bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).  Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted).

### B. Legal Standards Governing Claims of *Res Judicata*

#### 1. General Standards

"Under the doctrine of res judicata, or claim preclusion, 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Flaherty v. Lang*, 199 F.3d 607, 612 (2d Cir. 1999) (quoting *Rivet v. Regions Bank of La.*, 522 U.S. 470, 476 (1998)) (emphasis omitted); *see also Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981). *Res judicata* (claim preclusion) is distinct from the related doctrine of collateral estoppel (issue preclusion), which "refers to the preclusive effect of a judgment that prevents a party from litigating, for a second time, an issue of fact or law that has once been decided." *Yeiser v. GMAC Mortgage Corp.*, 535 F. Supp. 2d 413, 421 (S.D.N.Y. 2008). "The defense of *res judicata* . . . may be brought, under appropriate circumstances, either via a motion to dismiss or a motion for summary judgment." *Sassower v. Abrams*, 833 F. Supp. 253, 264 n.18 (S.D.N.Y. 1993).

Judgments on the merits entered by state courts have preclusive effect in federal courts. *Gianatasio v. D'Agostino*, 862 F. Supp. 2d 343, 348 (S.D.N.Y. 2012) (citing the Full Faith and Credit Clause of the United States Constitution, Art. IV, § 1, and the full faith and credit statute, 28 U.S.C. § 1783). A federal court's determination of the *res judiciata* preclusive effect of a judgment entered by a state court is governed by "the preclusion law of the State in which the judgment was rendered." *Marrese v. Am. Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) (discussing the full faith and credit statute); *see also Giannone v. York Tape & Label, Inc.*, 548 F.3d 191, 192–93 (2d Cir. 2008) ("When determining the effect of a state court judgment, federal courts, including those sitting in diversity, are required to apply the preclusion law of the rendering state." (internal quotation marks, citations, and alterations omitted)).

Under Vermont law, "under the doctrine of res judicata, or 'claim preclusion, a final judgment in previous litigation bars subsequent litigation if the parties, subject matter, and cause(s) of action in both matters are the same or substantially identical.' The doctrine 'bars parties from relitigating, not only those claims and issues that were previously litigated, but also those that could have been litigated in a prior action.'" *Nat. Res. Bd. Land Use Panel v. Dorr*, 113 A.3d 400, 403 (Vt. 2015) (citation omitted) (quoting *Faulkner v. Caledonia Cty. Fair Ass'n*, 869 A.2d 103, 107 (Vt. 2004), and *Carlson v. Clark*, 970 A.2d 1269, 1273 (Vt. 2009)); *see also Russell v. Atkins*, 679 A.2d 333, 335 (Vt. 1996) (*res judicata* "bars not only issues actually litigated but also those which 'should have been raised in previous litigation" (quoting *Berlin Convalescent Center, Inc. v. Stoneman*, 615 A.2d 141, 143–44 (Vt. 1992)).

Under Vermont law, whether an action could or should have been raised in a prior litigation is determined using two tests; if either applies, the claim is barred by *res judicata*. The first test asks whether the causes of action in the two lawsuits are the same, which in turn is defined by whether the evidence needed to sustain the second action would have sustained the first. The second, more modern test, asks whether the claims in the two lawsuits arise from the same "transaction or occurrence." *See Faulkner*, 869 A.2d at 108–09. That inquiry is broader. It requires "a plaintiff to address in one lawsuit all injuries emanating from all or any part of the transaction, or series of connected transactions, out of which the action arose." *Id.* (citing Restatement (Second) of Judgments § 24(1) (1982)). Under this test, the scope of a "'transaction' is determined by 'giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage"; no single factor is controlling. *Id.* at 109 (quoting Restatement (Second) of Judgments

§ 24(2)). "[E]ven when there is not a substantial overlap [between proofs relevant to two actions], the second action may be precluded if it stems from the same transaction." *Id.* (alteration in *Faulkner*; quoting Restatement (Second) of Judgments § 24 cmt. b.). "Thus, it follows from this flexible definition that 'where one act causes a number of harms to, or invades a number of different interests of the same person, there is still but one transaction.'" *Id.* (quoting Restatement (Second) of Judgments § 24 cmt. c.).

As Vermont courts have explained, the doctrine of *res judicata* serves two purposes: "to protect the courts and the parties from the burden of relitigation," *Russell*, 679 A.2d at 335, and to protect the integrity and finality of the judgments entered, *Nat. Res. Bd.*, 113 A.3d at 403 ("Requiring the litigation of all claims that could or should have been raised between the parties precludes later rulings that might 'nullify the initial judgment or . . . impair rights established in the initial action.'" (quoting *Carlson*, 970 A.2d at 1274) (ellipses in *Nat. Res. Bd.*)); *see also Pomfret Farms Ltd. P'ship v. Pomfret Assocs.*, 811 A.2d 655, 659 (Vt. 2002) ("[I]nvocation of res judicata . . . relieves parties of the cost and vexation of multiple lawsuits, conserves judicial resources, and, by preventing inconsistent decisions, encourages reliance on adjudication." (quoting *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 467 n.6 (1982)) (internal quotation marks omitted) (alterations in *Pomfret*)).

### 2. Standards Applicable Under Vermont Law to Foreclosure Actions

As the Court noted in denying the Plausteiners' motion to dismiss, Vermont's *res judicata* doctrine has distinct features to the extent that the suit claimed to have preclusive effect was a foreclosure action. A lawsuit to foreclose on property—an action in rem—does not bar a later suit on the underlying note or obligation—an action in personam. *LaFarr v. Scribner*, 549 A.2d 651, 652–53 (Vt. 1988) ("[I]f foreclosure of the mortgaged premises is insufficient to

satisfy a debt secured by such mortgage, then the creditor's recourse is through an action on the note, which is an action in personam.").  As the Vermont Supreme Court explained in *LaFarr*, a foreclosure action has more limited preclusive effect: "The issues raised in a foreclosure action include the validity of the mortgage, the amount of indebtedness due on the mortgage, and the right of the mortgagee to seek satisfaction of the indebtedness from the mortgaged property.  A judgment and decree of foreclosure will bar litigation of those issues in another action by virtue of the doctrine of res judicata."  *Id.* at 653.  But it does not preclude an ensuing action to collect the deficiency still owed on the underlying note following foreclosure.  *Id.* at 652 n.*, 653; *see also* MTD Decision at 21–27.[4]

### C.     Analysis of the Plausteiners' Claim of *Res Judicata*

Earlier in this litigation, the Plausteiners based their argument for *res judicata* on the fact that MFW's Supplemental Complaint in Vermont state court brought a claim for a deficiency judgment alongside its claim for foreclosure of the membership interests in Snowdance held by the Plausteiners (as well as those held by Realty, Hotel, and Ski).  The Court rejected that bid.  Although viewing the Plausteiners' motion as presenting a close question, the Court recognized that, under Vermont case law including *LaFarr*, the lack of a judicial sale of the assets at issue made a deficiency judgment unavailable.  MFW's bid for a deficiency judgment therefore was not tenable as a basis for invoking *res judicata*.

---

[4] As discussed in this Court's decision denying the motion to dismiss, these principles were applied in *Cowles v. Sunshine*, 2005 Vt. Super. LEXIS 26 (Vt. Super. Ct. Chittenden Cty. June 23, 2005), rejecting a claim of preclusion on the ground that a foreclosure action does not bar an action for deficiency but instead "sets the stage for a deficiency action."  *Id.* at *2; *see also* MTD Decision at 19–20.

In pursuing summary judgment, the Plausteiners have revised the theory on which they claim *res judicata*. They now emphasize that MFW's Supplemental Complaint in the Vermont foreclosure action included a breach of contract claim against the Plausteiners. Because that complaint was dismissed with prejudice, the Plausteiners argue, *res judicata* bars MFW from bringing a breach of contract claim here. Examining this new argument based upon the fuller record of the Vermont litigation that has now been presented, the Court agrees. *Res judicata* does bar this lawsuit, because the Supplemental Complaint actually brought—and in any event, certainly could and should have contemporaneously—brought claims against the Plausteiners for breach of the AFA.

At the outset, the Court rejects MFW's claim that the Plausteiners have waived their right to pursue their present theory of *res judicata*. To be sure, the manner of the Plausteiners' pursuit of that defense has been fragmented. The Plausteiners raised *res judicata* as a defense in their answer, but, in moving to dismiss, they pursued *res judicata* only belatedly (in their reply brief) and incompletely (relying on MFW's deficiency and foreclosure claims in Vermont, not, as now, on MFW's breach of contract claim in that litigation). Judicial economy would have been better served had the Plausteiners raised at the earliest possible opportunity all bases for claiming *res judicata*, while providing the Court with a comprehensive account of the Vermont litigation.

MFW, however, recites no case law that deprives the Court of discretion to consider this defense at this stage. The rules are to the contrary, as the primary means to objecting on the ground of insufficiency to a defense that has been asserted in an answer or other responsive pleading is a motion to strike under Federal Rule of Civil Procedure 12(f), a motion MFW has not made and that the Court declines to raise *sua sponte*, *see* Fed. R. Civ. P. 12(f)(a). Further, "[r]ulings of the district court are subject to revision by that court 'at any time before the entry of

final judgment. . . .'" *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 148 (2d Cir. 1999) (quoting Fed. R. Civ. P. 54(b)). And, while MFW has its counterarguments, strong considerations of fairness and efficiency, on balance, favor considering this potentially dispositive defense on its merits rather than treating it as waived. MFW, too, is equally responsible with the Plausteiners for the parties' joint failure, until now, to present the Court with a full, as opposed to disjointed, account of that litigation.

On the merits of the *res judicata* defense, to the extent based on MFW's breach of contract claim in the Vermont litigation, the pertinent facts are as follows. After PRIF had pursued foreclosure on the mortgage securing the PRIF Loan based on Snowdance's default of that mortgage and on the Forbearance Agreement, MFW, as PRIF's successor, entered into the AFA with Snowdance, the Plausteiners, Realty, Hotel, and Ski. In connection with the AFA, the Plausteiners, Hotel, and Ski executed pledge agreements—the MFW Pledge Agreements—in which they pledged their equity and membership interests in Snowdance as security for the AFA. *See* AFA § 8(a); MFW Pledge Agreements. Snowdance then defaulted on the first payment due under the AFA. And, on January 25, 2010, MFW filed the Supplemental Complaint in the Vermont Foreclosure Action. It sought to foreclose on the membership interests in Snowdance pledged by the Plausteiners and Realty, Hotel, and Ski.

Significant here, MFW also brought claims for breach of contract against all defendants, including the Plausteiners. And various allegations in the Supplemental Complaint, as to both liability and damages, reflected this aspect of its claims. MFW there brought a claim for breach of contract against Snowdance, based on the AFA, alleging that "[b]y failing to pay when due, Snowdance LLC is in breach of [the AFA]." Supplemental Complaint ¶ 24. MFW also brought a claim for breach of contract against the Plausteiners, Realty, Hotel, and Ski, based on the MFW

Pledge Agreements, alleging that "[b]y failing to pay when due, Guarantors are in breach of their Pledge Agreements." *Id.* ¶ 25.[5] As to both claims, MFW alleged that: "As a result of the breaches, [MFW] has suffered damages." *Id.* ¶ 26. As to the amount of Snowdance's default as a result of its breach, the Supplemental Complaint alleged: "As of December 31, 2009, Snowdance was in default [of the AFA] and owed $1,789,476 plus interest, late fees, attorneys' fees and other costs." *Id.* ¶ 18. And as to the other defendants, MFW alleged as to damages: "In each Pledge Agreement, each Guarantor [defined to include the Plausteiners and Realty, Hotel, and Ski] guaranteed the underlying debt of Snowdance" in addition to granting a security interest in their equity interests in Snowdance. *Id.* ¶ 19. Consistent with its theory of contract breach, MFW's Supplemental Complaint sought remedies including "compensatory damages." *Id.* at 6 ¶ C. (Claims for Relief). It further alleged that MFW "is now entitled to foreclose on the property described in the Pledge Agreements." *Id.* ¶ 26. MFW did not distinguish among the defendants when it sought "[a] declaratory judgment that Defendants have defaulted on their obligations under the [AFA]." *Id.* at 6 ¶ A. (Claims for Relief).

To be sure, the Supplemental Complaint brought other claims: for foreclosure against the Plausteiners for the equity interests in Snowdance they had pledged in the MFW Pledge Agreements and a judicial sale of those interests, *id.* ¶¶ 27–30, and for a deficiency judgment in the event that "the sale of the LLC interests in Snowdance is less than the amount of the debt secured by the guarantees then [MFW] will be entitled to a deficiency judgment against the

---

[5] The MFW Pledge Agreements define as an event of default "[t]he failure of the Borrower to pay promptly when due any sums payable on the [PRIF Loan] Note and other Loan Documents or any of the other Lender Obligations." MFW Pledge Agreements § 7(a); *see also id.* ¶ 1 (defining "Borrower" as the "Pledgor" (defined as the Plausteiners, Realty, Hotel, and Ski) and Snowdance); ¶ 6 (defining the "Loan Documents" as the PRIF Loan note and the MFW Pledge Agreements).

Guarantors," *id.* ¶¶ 31–32.[6] But these claims were only part of MFW's complaint. Indeed, the first of its three causes of action was for breach of contract, seeking compensatory damages. The second and third were, respectively for foreclosure and judicial sale of the Snowdance membership interests and for a deficiency judgment under V.R.C.P. 80.1(j)(2) in the event the sale of the membership interests netted less than the amount of the debt owed under the AFA. As noted, the parties—after a dispute arose over whether the Lift should be sold, with the Plausteiners filing objections to the sale—entered into the Joint Stipulation. It reflected the parties' agreement about the sale of the Lift and provided that the Supplemental Complaint "shall be dismissed with prejudice." Joint Stipulation ¶ 3. Judge Cohen approved the Joint Stipulation, in accordance with its terms. JSF, Ex. 6.

In light of MFW's claims against the Plausteiners sounding in breach of contract, the Supplemental Complaint and the Joint Stipulation meet the requirements of *res judicata*.

First, the Joint Stipulation dismissing the Supplemental Complaint with prejudice qualifies as an adjudication on the merits for *res judicata* purposes. *See Russell*, 679 A.2d at 335 (settlement including dismissal with prejudice binds parties as an adjudication on the merits) (citing *Littlefield v. Town of Colchester*, 552 A.2d 785, 786 (Vt. 1988)).

Second, the parties are identical in this action and in the Supplemental Complaint: In each, MFW was the plaintiff and the Plausteiners were defendants.

---

[6] As a remedy on this claim, MFW sought various findings and permission to conduct a sale of the equity interests, along with a "[j]udgment to [MFW] for all sums due and to become due" and "[a] deficiency judgment pursuant to V.R.C.P. 80.1(j)(2)," *id.* at 6 ¶¶ G.–H. (Claims for Relief).

Third, the subject matter of the prior suit is the same as in this one: The cases involve the same transaction documents, namely the AFA and the MFW Pledge Agreements executed in connection with the AFA.

Finally, the two lawsuits contain the same relevant causes of action—in both, MFW brought a claim for breach of contract based on the AFA and sought compensatory damages.

The Plausteiners' theory of *res judicata*, as now recast, thus lacks the shortcoming of the theory they pursued earlier. Unlike MFW's claim for a deficiency judgment in the Supplemental Complaint—which could not be ripe until the amount of any deficiency had been determined by a foreclosure sale of the pledged collateral and therefore under Vermont law could not be the basis for a finding of *res judicata*—MFW's breach of contract claim in Vermont state court was ripe for resolution then and there. MFW in that litigation claimed that compensatory damages were then due it from the Plausteiners, asserting that, "[i]n each of the Pledge Agreements, each Guarantor [including the Plausteiners] guaranteed the underlying debt of Snowdance," *id.* ¶ 19.

In opposing the Plausteiners' motion for summary judgment, MFW only scantly attempts to rebut the Plausteiners' reformulated *res judicata* theory. Instead, MFW mostly argues for waiver or responds to the Plausteiners' earlier *res judicata* theory. To the limited extent MFW engages at all with the Plausteiners' new theory based on MFW's breach of contract claim in Vermont, MFW seeks to distinguish the contract claims in Vermont from that here. Whereas MFW's Supplemental Complaint in Vermont asserted that Snowdance had breached the AFA and that the Plausteiners had breached the Pledge Agreements, here, MFW notes, its claim is that the Plausteiners breached the AFA. For two reasons, however, that distinction is unpersuasive as a basis for opposing the claim of *res judicata*. First, *res judicata* applies to claims that could or should have been brought based on the same transaction or occurrence. MFW easily could, and

should, have brought its claim for breach of the AFA against the Plausteiners alongside its claim for breach of the Pledge Agreements. These sequential and closely related agreements are part of the same occurrence and series of events, which together gave rise to Snowdance's default of the AFA. As the Second Circuit instructs, "it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies," *Saud v. Bank of New York*, 929 F.2d 916, 919 (2d Cir. 1991) (quotation omitted). Second, the Supplemental Complaint is easily read to assert claims against the Plausteiners for breach of the AFA: As relief there, MFW sought a declaratory judgment that "Defendants"— which included the Plausteiners—"have defaulted on their obligations under the [AFA]," *id.* at 6 ¶ A. (Claims for Relief). And the count in which MFW pleads Snowdance's and the Plausteiners' breaches of the AFA and the Pledge Agreements, respectively, was described there as "COUNT 1 (Breach of Amendment No. 1 [AFA])". *Id.* ¶ 22–26.

In short, in the Supplemental Complaint MFW sued the Plausteiners for compensatory damages based on breach of the AFA, just as it does here, and that action was dismissed with prejudice. Under the governing principles of *res judicata*, MFW's suit here based on breach of the AFA is, therefore, barred.

**D.      The Parties' Arguments Based on the AFA**

In light of the Court's holding that *res judicata* bars this lawsuit, the Court does not have occasion to firmly resolve the parties' competing arguments for summary judgment based on the AFA. As noted, MFW contends that the AFA makes the Plausteiners liable on the PRIF Loan,

*see, e.g.*, MFW Memo at 3–7, whereas the Plausteiners claim that it releases them from liability on the PRIF Loan, *see, e.g.*, Plausteiner Reply at 18–19, 38.[7]

### E.    MFW's Motion to Attach

In light of the grant of summary judgment to the Plausteiners' based on *res judicata*, the Court denies as moot MFW's motion to attach the Plausteiners' personal residence in Vermont.

## CONCLUSION

For the foregoing reasons, the Court grants the Plausteiners' motion for summary judgment, on the ground that this lawsuit is precluded by *res judicata*. Accordingly, MFW's motion for summary judgment is denied, and its motion for an attachment of real property is denied as moot. The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 89, 94, and 107, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 2, 2017
     New York, New York

---

[7] To the extent the Court's assessment is useful to the parties or counsel, the Court's assessment of the AFA remains that the AFA releases the Plausteiners from liability in only one capacity (as "Guarantors"); that the AFA's language is clear on this point; and that the extrinsic evidence that the Plausteiners advance (for example, a declaration from Steven Plausteiner as to his understanding of the AFA, *see, e.g.*, Plausteiner Aff. ¶¶ 20–21) is inadmissible, both because the AFA is not textually ambiguous and because such testimony is not a proper form of extrinsic evidence to demonstrate an ambiguity in otherwise unambiguous language. *See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998).